Filed 6/24/13  P. v. Rueda CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E052699 |
| v. | (Super.Ct.No. FVA800920) |
| HECTOR MAURICE RUEDA III, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Arthur Harrison, Judge.  Affirmed with directions.

Harry Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meagan J. Beale and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant, Hector Rueda, III, of voluntary manslaughter (Pen. Code, § 192, subd. (a)), during which he used a knife (§ 12022, subd. (b)(1)), attempted

1

voluntary manslaughter (§§ 664/192, subd. (a)), during which he used a knife and inflicted serious bodily injury (§ 12022.7, subd. (a)), and carrying a dirk or dagger (§ 12020, subd. (a)(4)). He was sentenced to prison for 12 years and appeals, claiming evidence was improperly excluded, the jury was misinstructed and the sentencing court erred in imposing certain fees. We reject his contentions, while directing the trial court to correct errors in the minutes of the sentencing hearing and the abstract of judgment.

## FACTS

The manslaughter victim and Jennifer were involved in a three-year long serious romantic relationship. During this time, defendant and the manslaughter victim were good friends. Shortly after the couple broke up, defendant began dating Jennifer. The manslaughter victim wanted nothing to do with defendant. Jennifer came to consider herself to be defendant's wife, until they broke up nine months before trial. However, at the time of the trial, she still loved defendant.

On May 16, 2008, defendant, Jennifer, Chris and Roberto attended a party that was also attended by the manslaughter victim, who, there, ran into his friend, Renee, Renee's sister and the attempted manslaughter victim. At 12:30 the next morning, the attempted manslaughter victim, Renee and Renee's sister left the party to go to Renee's house. The manslaughter victim and another companion also went to Renee's, but in a separate car.

Jennifer testified that she, defendant, Chris and Roberto then went to a second party, during which she discovered that someone had scratched her car, writing the word, "Bitches" on it. She was very upset and she and defendant assumed that Renee and his

2

sister had done it because she had had problems with them before. As defendant drove her car, she made a series of angry calls to the manslaughter victim's cell phone during which she asked him if they had done it. The manslaughter victim denied that he did it and first said he did not know if his friends had done it, adding that they did not do things like that, then later said that they did not. Jennifer testified that the manslaughter victim invited her to come to Renee's to discuss the matter. While defendant drove her car, she told him what the manslaughter victim had told her during their phone conversations. Defendant was possibly angry on the way to Renee's. At some point during the trip, Jennifer reached into the glove box to retrieve a can of beer and found, inside, a steak knife she kept there for protection. She wondered out loud if the knife was sharp enough to puncture someone's tires. Defendant felt the tip of the knife. She said if they discovered who scratched her car, they would scratch that person's car and slash the tires. Defendant agreed to do this with her.[1] She either returned the knife to the glove box or defendant took it from her, but she did not see him put it in his pocket. Chris and Roberto said they should not go to Renee's—that they had no proof that anyone there had scratched Jennifer's car. Jennifer told defendant that they should not go, but defendant said it would be alright, as they were just going to talk.

---

[1] Jennifer also variously testified that defendant agreed that *she* would damage the scratcher's car and that defendant never said he was going to do this.

Because this appeal is so heavily fact-intensive, we have extensively and in great detail reported the facts adduced at trial.

Chris testified that both defendant and Jennifer were angry about her car getting scratched, they discussed who might have done it and assumed that it could be the manslaughter victim, in addition to others.[2] According to Chris, Jennifer was upset when she called the manslaughter victim on his cell phone and she accused either he or his friends of scratching her car. Jennifer told the manslaughter victim that she was coming to Renee's. After Jennifer's phone conversation, she said that none of the people at Renee's had scratched her car, but defendant said, "'Let's go over there and talk to them.'" Defendant and Jennifer said they were going to talk to the people at Renee's. Soon, their talk turned to how they were going to mess up a car when they got to Renee's. They were upset.[3] Chris and Roberto said it wasn't a good idea for them to go—that they didn't know who had scratched Jennifer's car.[4] Jennifer agreed, but defendant said they still should go.

Roberto testified that he thought Jennifer had put the knife back in the glove box during the ride to Renee's.

The attempted manslaughter victim testified that when the manslaughter victim arrived at Renee's, he told the attempted manslaughter victim that he had just gotten a call from Jennifer that someone had keyed her car and she thought it was the

---

[2] Roberto testified similarly.

[3] Roberto testified similarly.

[4] Roberto testified similarly.

4

manslaughter victim or one of them that had done it.[5]  He said that they were coming over with a bunch of guys to settle matters or to retaliate.

The attempted manslaughter victim testified that Jennifer's car drove down the cul-de-sac, turned around and stopped in the middle of the street in front of the house next door.  With the car still running, Jennifer and defendant got out and Jennifer, with defendant following, angrily approached the manslaughter victim and accused him of scratching her car.[6]  Even though the manslaughter victim denied doing this, Jennifer kept shouting at him.  The manslaughter victim told Jennifer and defendant to leave[7] and not to continue disrespecting Renee's parents' house.  After three to four minutes of this shouting, defendant, using expletives, told the manslaughter victim to admit that he or his friends had scratched Jennifer's car.[8]  The attempted manslaughter victim began slowly walking towards Jennifer and defendant because he saw that defendant had his hand balled up in his pant pocket.  The manslaughter victim attempted to reassure defendant that he did nothing to Jennifer's car and defendant verbally rebuffed him.  Defendant

---

[5] Renee's sister's testified similarly.  She added that Jennifer was coming over to do something to Renee's car and the manslaughter victim told the people at Renee's that they should get baseball bats to scare them off.

[6]  Renee's sister testified that Jennifer also threatened to "fuck up" Renee's car. Renee testified similarly.

[7]  Renee and Renee's sister testified similarly.  The sister added that the attempted manslaughter victim also told Jennifer and defendant to leave.

[8]  Renee testified similarly.

moved his hand up and down inside his pocket and the attempted manslaughter victim concluded that defendant had something in there.[9] Defendant said to the manslaughter victim, "What the fuck are you going to do about it" which the attempted manslaughter victim took as a challenge to fight. The attempted manslaughter victim took four steps towards Jennifer and defendant and told defendant to calm down and take Jennifer and leave "before something bad goes down." Defendant then turned his attention to the attempted manslaughter victim. He moved closer to the latter and aggressively said to him, "What the fuck?" Defendant then pulled out whatever was in his pocket and brought his hand up to his waist or chest. The attempted manslaughter victim hit defendant in the chin, hoping defendant would drop whatever he had in his hand. Defendant shook off the punch, came at the attempted manslaughter victim, and the two began hitting each other, but the latter did not realize that defendant was stabbing him with a knife instead of hitting him with his fist. Defendant was erect during their fight.[10] Jennifer, Chris and Roberto were eventually able to hold defendant back and the attempted manslaughter victim then realized that he had been stabbed. He stepped away from defendant[11] and went into Renee's house and got towels, bandages and peroxide for his wounds. When the attempted manslaughter victim went back outside, the manslaughter victim was lying on the driveway, having already been fatally wounded.

_____

[9] Renee testified that defendant had his fist balled up in his pocket.

[10] Renee testified similarly.

[11] Renee and Renee's sister testified similarly.

Jennifer testified that while she was yelling at the manslaughter victim after arriving at Renee's, she accused Renee of scratching her car and he began yelling at her.[12] She also testified that before the attempted manslaughter victim hit defendant, the manslaughter victim had said to her, in a very upset manner, that nothing mattered because she did not care about him anymore. She also testified that defendant tried to reassure the manslaughter victim that Jennifer still cared about him, then the attempted manslaughter victim ran up to defendant and punched him. She did not see defendant make an aggressive movement towards or threaten the attempted manslaughter victim before the latter punched defendant. She claimed that the manslaughter victim tried to get involved in the fight between defendant and the attempted manslaughter victim, she tried to restrain the manslaughter victim, but he broke away from her and the two victims together began hitting defendant. She claimed that defendant responded to them hitting him by swinging at them from side to side, near their waists, with his head down, while leaning forward. Then, her attention was drawn away from defendant and the victims by Renee and his sister approaching her and yelling at her.

Chris testified that Renee and the victims each had had a bat in his hand when Jennifer's car had stopped in the street, but the victims had thrown theirs away towards the end of the verbal argument between the two groups.[13] Argumentative words were

---

[12] Renee testified similarly.

[13] Renee's sister testified that Renee and the manslaughter victim had gotten baseball bats in response to the latter telling them that Jennifer and her companions were on the way to damage Renee's car and the baseball bats would be used to scare the latter.

*[footnote continued on next page]*

7

exchanged between defendant and the manslaughter victim, then the attempted manslaughter victim began fighting defendant. According to Chris, defendant stood erect during his fight with the attempted manslaughter victim. After 12 or 13 seconds of fighting, the attempted manslaughter victim stopped and stepped away from defendant and, five seconds later, the manslaughter victim approached defendant and began fighting with him. Defendant stood erect while fighting the manslaughter victim. When, after six or seven seconds of fighting, it appeared that defendant was losing, Jennifer yelled for Chris to "help [defendant]" and Chris stepped between them and pushed defendant away.

Roberto testified that during the verbal argument, Renee told defendant and Jennifer to leave.[14] He testified that the 15-20 second physical fight between defendant and the attempted manslaughter victim ended and the latter backed off, then, a few seconds later, the manslaughter victim stepped in and hit defendant, then, eventually, tripped over a utility box and tried to grab defendant.[15] Defendant stood erect during his 10-20 second fight with the manslaughter victim, which ended when Jennifer told Chris

---

*[footnote continued from previous page]*
Renee testified that he got a bat to protect himself and his property, the manslaughter victim had one, too, and they had agreed to use them to scare off Jennifer and her companions. He added that when Jennifer's car arrived in the street, the headlights from the car lit them up as well as their baseball bats. He also said that the manslaughter victim dropped his baseball bat before he started to fight with defendant.

[14] Renee testified similarly.

[15] Renee also testified that the manslaughter victim tripped over the box. He added that the manslaughter victim fell on his back onto the hood of a car parked in the driveway and defendant continued to stab him two to three times.

to break it up and Chris pushed defendant.  He said only Renee and the manslaughter victim had had bats, but they had thrown them away and the bats were not used in the physical fights.  He also said that before the attempted manslaughter victim threw the first punch at defendant, he told defendant that the latter had come to the wrong neighborhood[16] and the two argued, with the former shouting, for less than 10 seconds. According to Roberto, the attempted manslaughter victim was arguing with defendant vehemently, while defendant was backing up and telling the former to calm down—that he just came there to talk.  The attempted manslaughter victim had removed his shirt before his physical fight with defendant began.

Renee's sister testified that while the attempted manslaughter victim and defendant were fighting in one area, she, the manslaughter victim and Renee were in another area.  She also said that when she was in the house with the attempted manslaughter victim, after the latter had been stabbed, she called out to Renee to get more towels, and Renee entered the house and did so.[17]

Renee testified that the manslaughter victim began fighting with defendant 10-15 seconds after the fight between the attempted manslaughter victim and defendant ended. Defendant stood straight during both fights.

Defendant testified that he attempted to be conciliatory towards the manslaughter victim at the end of the verbal argument, but the former was having none of it, and he

---

[16]  Renee's sister testified similarly.

[17]  Renee testified similarly.

spoke aggressively with foul language to defendant. Although the attempted manslaughter victim had removed his shirt and was pacing back and forth, no words were exchanged between him and defendant. Contrary to the version of events offered by any others of those present, defendant testified that the *manslaughter victim* ran up to him and punched him in the face. Defendant tried to pull back but the manslaughter victim grabbed him by the collar of his shirt, pulled him down and held him down, bent at the waist, while he and the attempted manslaughter victim, who similarly held onto defendant, hit him in the head. Defendant testified that he "felt" Renee coming at him with a bat and he pulled the knife out of his pocket and swung wildly at both victims.

The manslaughter victim had eight stab wounds including fatal ones to the front of his neck and his lung and liver. The attempted manslaughter victim had six stab wounds including ones to the back of his neck and his chest.

1. *Exclusion of Evidence*

   a. *Evidence that the Manslaughter Victim Was Not Angry or Upset at Defendant Shortly Before the Crimes*

      1. *Other Evidence Introduced at Trial on the Matter*

Jennifer testified that she had told an investigator that prior to May 17, 2008, defendant had repeatedly, on different occasions, tried to talk to the manslaughter victim, but the latter did not want anything to do with defendant and would walk away. She confirmed that after she broke up with the manslaughter victim, he wanted nothing to do with defendant and every time defendant wanted to talk to the manslaughter victim, the latter got away from him. She said that at the time of the crimes, defendant and the

manslaughter victim did not like each other because defendant was going out with Jennifer and the manslaughter victim still loved her. She said that even though defendant and the manslaughter victim saw each other at numerous parties for months leading up to the crimes, the manslaughter victim had tried to avoid defendant. During cross-examination by defense counsel, she testified, in response to leading questions by counsel, that as of May 2008, she believed that the manslaughter victim still cared for her and wanted to be with her, and that he was upset that she had started dating defendant. Also in response to leading questions by defense counsel, she said that the manslaughter victim told her three weeks before the crimes that he was cutting himself because he couldn't get over the fact that she was with defendant and he still loved her and wanted to be with her. She also answered a leading question by defense counsel that at a party attended by her, the manslaughter victim and defendant three weeks before the crimes, the manslaughter victim was sarcastically telling people to tell defendant to approach him and say hello to him. She also testified during cross-examination that she approached the manslaughter victim the night before the crimes at the first party and hugged him and shook his hand. At that time, defendant went up to the manslaughter victim and tried to shake his hand, saying "'Are we not friends anymore?'" The manslaughter victim replied in the negative. Defendant asked him why and the manslaughter victim pointed to Jennifer and said, "That's why." Defendant asked the manslaughter victim if he and the latter were "'still cool'" and the latter replied that they were not.

Chris, who was friends with Jennifer, defendant and the manslaughter victim, testified that at the time of the crimes, defendant and the manslaughter victim ignored

11

each other.  He said that at the first party, the manslaughter victim told him that he and defendant were no longer friends and he appeared to be upset with defendant.  The manslaughter victim added that defendant had tried to shake his hand at the party, but he had told defendant that he did not like him.  While still at the party, defendant told Chris that he was upset about this.  During cross-examination by defense counsel, Chris testified that the manslaughter victim had told him at the first party that defendant had approached him and said, "'We're cool, right?'" and the manslaughter victim had responded, "'No, we're not cool.'"  Defendant asked the manslaughter victim why and the latter replied that it was because of Jennifer, and the manslaughter victim seemed to be "a little bothered" about seeing defendant and Jennifer together.  Chris saw defendant approach the manslaughter victim and try to shake his hand, but the latter did not, and it was at this time that the conversation about being cool occurred.

Roberto testified that he was more of a friend to defendant than he was to the manslaughter victim.  He said that at the first party, defendant and the manslaughter victim "had a little grudge going, . . . they weren't getting along."  The manslaughter victim had sarcastically said to defendant, "'I thought we were friends.'"  During the argument that led up to the physical fight(s) at Renee's, as the manslaughter victim got louder and started to cuss, defendant said, "'I haven't done anything to you.'"  The manslaughter victim replied, "'Oh, I thought we were friends.'"  Defendant replied that they were, which Roberto took as a sincere comment.  According to Roberto, before the crimes, the two were not getting along.  It was his impression that they were enemies.

12

Defendant testified that at the first party, the manslaughter victim gave him and Jennifer a hug and said hello.[18] Ironically, he also testified on direct that when he told the manslaughter victim where he and Jennifer were working, the former replied sarcastically and when he asked the manslaughter victim if he and the manslaughter victim were cool, the latter replied that they were not. In fact, defendant testified on direct that when Jennifer asked him, on the way to Renee's, if he thought the manslaughter victim and his friends had scratched her car, he said he did not know, but he reminded her of what had taken place between him and the manslaughter victim at the first party.[19] During cross-examination by the prosecutor, he also admitted that the manslaughter victim had refused to shake his hand at the first party and that the latter "mad-dogged" defendant.

On direct examination, defendant testified that after Jennifer began arguing with the manslaughter victim at Renee's, Renee and his sister joined the argument and began to curse, the manslaughter victim's friends were "mad-dogging" defendant and the manslaughter victim told Jennifer that he knew he meant nothing to her. In response to this comment, defendant said to the manslaughter victim, "'Don't say that.'"[20] The

---

[18] He was the only witness to so testify. Even Jennifer said that the manslaughter victim gave only her a hug.

[19] On cross-examination, defendant admitted that he told Jennifer on the way to Renee's that "it had to be [the manslaughter victim] and his friends" who scratched her car.

[20] The only other witness who testified to any exchange like this was Jennifer, who said that at some point during her argument with the manslaughter victim and

*[footnote continued on next page]*

13

manslaughter victim then addressed defendant, saying, "'And you. You used to be my homie. Fuck you. Fuck you.'"[21] Defendant asked the manslaughter victim what defendant had done to him. The manslaughter victim responded, "'Fuck you. What's up? What's up? What's up?'" The manslaughter victim continued to say, "' Fuck you'" to defendant and ran up to him and began hitting him.

During subsequent direct testimony, defendant added that when the manslaughter victim had said that he meant nothing to Jennifer, he also said that he meant nothing to "you guys." At that point, defendant testified, he felt compelled to interject himself into the argument between Jennifer, the manslaughter victim and Renee because, "' . . . [I]t's not true. [¶] . . . [¶] That Jen[nifer] or me don't care about [the manslaughter victim]. [¶] . . . [¶] . . . I tried to tell him, we do care about you . . . . [¶] . . . [¶] . . . [I was j]ust letting him know that we do care.'"

At the beginning of cross-examination, defendant admitted that when he was first interviewed by the police, he told them that he and the manslaughter victim were friends, however, later, he admitted that when he and Jennifer saw the manslaughter victim

---

*[footnote continued from previous page]*
Renee, the manslaughter victim said to her, "'What does it matter? You don't care about me anymore anyways [*sic*].'" Defendant then calmly responded to the manslaughter victim, "'Come on, Joe. You knew that she cares about you.'" However, she did not testify that the manslaughter victim angrily accused defendant of betraying him, as defendant did in his testimony—rather, she said that at that point the attempted manslaughter victim ran up to defendant and punched him.

[21] During cross-examination by the prosecutor, defendant testified that the manslaughter victim called him a backstabber and was angry at him. The manslaughter victim also asked defendant, "'What are you going to do about it?'"

around, the manslaughter victim never said hello.  He also admitted that when the

manslaughter victim found out that defendant was dating Jennifer, he was upset and hurt.

2. *Motion to Admit Evidence and Trial Court's Ruling*

After the prosecutor concluded her cross-examination of defendant, defense

counsel filed a written motion to be allowed to introduce the testimony of a man who

claimed to be best friends of both defendant and the manslaughter victim in May 2008.

As an offer of proof, the defense asserted that this man would testify, inter alia,[22] that he

was at the first party on May 18th, and, while there, the manslaughter victim told him that

he had only recently found out that Jennifer had begun dating defendant and, when asked

if he was upset about this, the manslaughter victim said he was over it and had started a

new life.[23]

_____

[22] The motion included other matters this witness would testify to, however, they do not appear to be relevant to the issue raised by defendant, and, therefore, will not be discussed here.

[23] In their brief, the People assert that the conversation between the manslaughter victim and this man preceded the arrival of defendant and his companions at the party. However, the record is not clear in this regard.  Defendant testified that at some point during the party, he called this man, who was not at the party, and asked him to come to it.  Defendant did not testify when this man arrived at the party and certainly did not say whether the man's arrival preceded or happened after his interaction with the manslaughter victim.  When first discussing this man's proposed testimony, defense counsel asserted that the manslaughter victim "*may have* then, after he had this conversation [with the man], . . . seen [defendant] at the party with Jennifer . . . , and it bothered him more than what he had thought intellectually about it . . . .  [¶] . . . [¶] Even if [the manslaughter victim] was . . . more bothered [about defendant being with Jennifer] than what . . . he was saying earlier that night, that's a lot different [than defendant and the manslaughter victim] being enemies."  However, there was no evidence about when the manslaughter victim's conversation with this man took place in relation to his interaction with defendant.

*[footnote continued on next page]*

15

At the hearing on the motion, defense counsel stated that he wanted to introduce the evidence to show the manslaughter victim's state of mind. Specifically, he asserted that during the first 40 minutes of her cross-examination of defendant, the prosecutor had attempted to create the impression that at the time of the crimes, the manslaughter victim did not like defendant, that defendant had lied to the police about his relationship with the manslaughter victim when he claimed they were friends, and, "they were actually friends."[24] The prosecutor opposed the admission of this evidence, arguing that the manslaughter victim's state of mind was irrelevant. The trial court ruled that even though

---

*[footnote continued from previous page]*

Defendant below and here, and the People here, assert that defendant testified that things between him and the manslaughter victim were fine until a third person made a derogatory comment about the manslaughter victim. However, this misconstrues defendant's testimony. He stated that the manslaughter victim spoke sarcastically to him, *then*, a third person said to Jennifer in the presence of defendant and the manslaughter victim that her ex-boyfriend, meaning the manslaughter victim, was "so lame." Defendant apologized to the manslaughter victim for the comment, the manslaughter victim replied that it was "all right" and "cool," then added, "Just don't talk to me right now." After that, defendant asked the manslaughter victim if they were cool and the latter said they were not. There is little basis, especially in light of the manslaughter victim's sarcastic comment to defendant before the third person said anything (in addition to all the other testimony by other witnesses about the relationship between defendant and the manslaughter victim before the party), to conclude that things between defendant and the manslaughter victim were fine until this third person made his comment.

Defendant calls our attention to his testimony at trial that he did not believe the manslaughter victim would ever attack him. This evidence undermines his claim of self-defense, i.e., if he believed the manslaughter victim would never attack him, then he had no reasonable basis for believing that his life was in danger at the hands of the manslaughter victim to the point that he needed to use deadly force against him.

[24] This precisely mirrors defense counsel's earlier remarks about the purpose for which he planned to introduce this evidence, before he temporarily abandoned his intention to do so.

16

defense counsel had described the proffered testimony as circumstantial evidence of the manslaughter victim's state of mind, it was really being offered for the truth of the matters asserted therein, and, therefore, was hearsay. If it was not, it was not relevant. Therefore, it was inadmissible. The court added that there had been a great deal of testimony about the relationship between defendant and the manslaughter victim, that relationship was somewhat fluid and what occurred at the first party was not necessarily the manslaughter victim's state of mind at the time of the crimes. The court concluded that the evidence would add nothing but length to this already lengthy trial. Defendant here contends this ruling was an abuse of discretion. (See *People v. Rowland* (1992) 4 Cal.4th 238, 264.)

Defendant asserts that the manslaughter victim's statements to his friend were admissible to show the manslaughter victim's state of mind, which was relevant to defendant's claim that he acted in self-defense. Unfortunately for defendant, that was not the basis he asserted below for the admission of these statements.[25] Therefore, he waived this basis. (See *People v. Homick* (2012) 55 Cal.4th 816, 867; Evid. Code, § 354.) Below, defendant sought introduction of the statements to contradict the implication created by the prosecutor's cross-examination of defendant that the manslaughter victim did not like defendant and that defendant had lied to the police when he said they were friends. Of course, as our summary of the other evidence introduced on this subject

---

[25] We suspect this is the case because defendant's current position makes no sense. If, in fact, the manslaughter victim did not harbor any bad feelings towards defendant, this would make it *less* likely, not more likely, that he would behave aggressively towards defendant, causing defendant to have to protect himself.

stated above, *some of it by defense counsel himself*, shows the manslaughter victim did not like defendant. As stated before, even defendant, himself, admitted that the manslaughter victim was upset and hurt by the fact that defendant was dating Jennifer and the manslaughter victim exhibited his hostility towards defendant at the first party. As we have noted, defendant introduced evidence that *defendant* was not angry at the manslaughter victim in order to disprove the prosecution's theory that defendant was angry at the manslaughter victim when he went to Renee's and armed himself with the knife in order to use it on the manslaughter victim before getting out of the car. However, this was relevant to *defendant'*s state of mind, and had nothing whatsoever to do with the *manslaughter victim's* state of mind.

Defendant also asserts that the trial court abused its discretion in inferentially determining that the probative value of this evidence was outweighed by its prejudicial impact. Based on the theory advanced below by the defense for the admissibility of this evidence, which is the only theory we may examine on appeal, we disagree with defendant. As already stated, there was a wealth of evidence that the manslaughter victim was angry at or upset with defendant, some of it introduced by defense counsel, himself, and some of it admitted by defendant, himself. To introduce the evidence at issue would have contradicted this evidence. At the same time, defendant was able to introduce evidence that he was not angry at the manslaughter victim, which was the purpose of seeking admission of this evidence. Therefore, he was not deprived, by this ruling, of the opportunity to put on this defense. Finally, the evidence was of minimal impact in that it contradicted defendant's own testimony, and that of *all* the other

18

witnesses in attendance at the party, that the manslaughter victim behaved in a manner that was consistent with him not being friends with defendant. We agree with the trial court's implied finding that this evidence, under these circumstances, would have had minimal impact on the jury favorable to defendant, and it would have lengthened this already lengthy trial.

b. *Evidence of the Manslaughter Victim's State of Intoxication*

Before trial began, while discussing what could and could not be addressed during opening statements, the prosecutor asserted that the manslaughter victim's alleged blood alcohol level of 0.18 percent was irrelevant. Defense counsel countered that it was relevant to the manslaughter victim's ability to accurately perceive events. He added that he did not think an expert's opinion was needed to show that someone with that level of alcohol "may sometimes be more aggressive than the person may be" when they are sober—that this was within "people's common experience." The trial court observed that while "there may be testimony that makes it relevant" it was not particularly so at that point, and, therefore, could not be mentioned during opening statements. However, the fact that the manslaughter victim had been drinking could be.

Before the pathologist who performed the autopsy on the manslaughter victim's body testified, the People reasserted their belief that evidence of the manslaughter victim's blood alcohol level was irrelevant. Defense counsel countered that the fact that the prosecutor had asked Roberto, Chris and Jennifer how much they had had to drink and who they saw drinking just before the crimes suggested that the manslaughter victim's blood alcohol level was just as relevant. The trial court pointed out that those

19

three witnesses were testifying about their observations at the time of the crimes, therefore, their state of sobriety/intoxication was relevant to their ability to perceive, whereas the manslaughter victim would not be testifying. However, the court reiterated, the fact that the manslaughter victim was drinking shortly before the crimes was relevant.

The defense sought to introduce expert testimony about the nature of the wounds inflicted on the manslaughter victim and the attempted manslaughter victim (to demonstrate that they were not defensive wounds, but were inflicted while they were attacking defendant). Included in this expert's report was a statement that the manslaughter victim's blood alcohol level was 0.18 percent. The prosecutor sought to exclude mention of this during this expert's anticipated testimony on the bases that there was no foundation for it and it was irrelevant to whether the wounds inflicted on the manslaughter victim were defensive or the result of the manslaughter victim attacking defendant. During an Evidence Code section 402 hearing, the expert stated that he obtained the manslaughter victim's blood alcohol level from the autopsy report and it was relevant to his opinion about the nature of the manslaughter victim's wounds only because "it explains to me why somebody would be stupid enough to go up against somebody with a knife if all they have is their fist." However, the expert added, it did not affect whether the wounds were defensive or the result of offensive action by the manslaughter victim. The trial court ruled that evidence of the manslaughter victim's blood alcohol level would be excluded.

Defendant here contends that the trial court erred in so ruling. To the extent defendant's opposition to the People's three requests to have this evidence excluded may

20

be viewed as efforts by defendant to have this evidence admitted, we reiterate that defendant here is confined to the bases he advanced below for admission. We must determine whether the trial court abused its discretion by excluding the evidence.

The first basis was that it was relevant to the manslaughter victim's ability to accurately perceive what was happening. Defendant did not explain below, and does not explain here, how this was relevant to anything and we fail to see any relevancy. Next, defendant asserted that it is "common experience" that anyone with a blood alcohol level of 0.18 percent would be more aggressive than when sober. In other words, jurors could be told merely that the manslaughter victim had such a blood alcohol level, and, based on that fact, they could reasonably infer that he was more aggressive than he would have been had he been sober. There are two problems with this theory. First, it is not within the common understanding of a lay juror that anyone with a 0.18 percent blood alcohol level is more aggressive than the person would be when sober. It is, however, a fairly common experience that different people react differently to alcohol—some become friendly, others not and still others do not react either way at 0.18 percent.[26] It also

---

[26] Defendant's reliance on language in *People v. Stitely* (2005) 35 Cal.4th 514, 549 (*Stitely*), that expert testimony is not necessary for a jury to know that people under the influence of alcohol behave in ways they do not ordinarily is misplaced. In *Stitely*, the parties stipulated that the victim had a blood alcohol level of 0.26 percent *and was intoxicated*. (*Id*. at p. 548.) The defense wanted its expert to testify that the victim's level of intoxication lowered her sexual inhibitions, thus increasing the likelihood that she consented to sex. (*Id*. at p. 549.) In rejecting defendant's contention that the trial court abused its discretion in excluding this evidence, the California Supreme Court commented that it is common knowledge that people act under the influence of alcohol in ways they do not ordinarily behave and jurors could assess for themselves the effect of alcohol on the victim's impulse and inhibitions. (*Id*. at p. 550.) However, there is a great

*[footnote continued on next page]*

depends on the person's tolerance for alcohol—alcoholics with a 0.18 percent may behave no differently than they would sober, and might, in fact, behave more peacefully then when sober. While these matters might have been ripe for expert opinion, defendant was not offering that—merely leaving the jury, on its own, to guess what effect a 0.18 percent blood alcohol level had on the manslaughter victim. The second problem is that even if some, most or all people behave more aggressively than when sober, the statement is meaningless without quantifying the extent of the aggressiveness and defendant was not prepared to do this , but, rather, leave it to the jury to figure out on its

---

*[footnote continued from previous page]*
difference between the common knowledge of the effect of alcohol on one's sexual impulses and inhibitions and whether alcohol makes any given person more aggressive than otherwise. There is also a great deal of difference between a woman's blood alcohol level of 0.26 percent and a man's 0.18 percent.

Defendant also cites *People v. Seaton* (2001) 26 Cal.4th 598, which, like *Stitely*, does not support his position. In *Seaton*, the California Supreme Court observed that a layperson would know that a 0.13 percent blood alcohol level would impair, but not destroy, a man's ability to form the intent to kill. That is a far cry from the proposition than any person with a blood alcohol of 0.18 percent behaves more aggressively then when he or she is sober.

Also distinguishable is *People v. Wright* (1985) 39 Cal.3d 576, 583, 584, in which the Supreme Court held that the trial court abused its discretion under Evidence Code section 352 by excluding evidence that the victim was under the influence of heroin where the defendant claimed that the victim behaved irrationally, requiring the defendant to kill him in self defense, and another witness testified that the victim had ingested no narcotics in the 24 hours preceding his death. In determining that the exclusion of this evidence did not require reversal of the defendant's conviction of first degree murder, however, the Supreme Court said the following, which is instructive here, "Defendant's offer of proof did not . . . include any proposed testimony concerning the *effects* of heroin, or the level of morphine contained in the victim's urine, or the *significance of any particular level* of morphine. Although the excluded evidence would have allowed the jury to infer the victim was under the influence of heroin, this inference would have done little towards corroborating defendant's testimony that the victim was, as a result, irrational and aggressive." (*Wright* at p. 585, italics added.)

22

own, without expert assistance. However, more telling on this subject was the testimony introduced at trial as to the manslaughter victim's actual conduct before and during the physical fight involving him. From this evidence, the jury could determine whether he was acting aggressively or not. There was no need to resort to the not necessarily helpful fact that he had a 0.18 percent blood alcohol.

Finally, the opinion of the defense pathologist that the manslaughter victim's 0.18 percent blood alcohol would explain why he would be stupid enough to go up against defendant, who had a knife, when all the former had was his fist, is undermined by the testimony of *all* the witnesses to these crimes, including defendant, that the latter did not reveal the presence of the knife before he began using it on the victims, and all those present, except defendant, did not even know that defendant had a knife until after the latter had stopped stabbing the attempted manslaughter victim and they saw the blood on the latter's clothes.[27]

Defendant here asserts that he could have "show[n] the general effect of a [0].18 [percent blood alcohol] through [the autopsy pathologist] or [the defense pathologist] or even another witness[.]" However, defendant made no such offer of proof below, and is, therefore, foreclosed from asserting that such evidence could have been produced. Defendant's assertion that the manslaughter victim's level of intoxication was relevant to defendant's state of mind, and thus to his claim of self-defense, is supportable only to the

---

[27] For example, defendant testified that neither the attempted manslaughter victim nor the manslaughter victim knew he had a knife.

extent that defendant perceived that the manslaughter victim was intoxicated (and, perhaps, therefore more likely to be a danger to him), and this he could have testified to, but did not.[28] Had he so testified, it is conceivable that the defense might have been able to introduce evidence of the manslaughter victim's actual blood alcohol level to bolster defendant's claim that the manslaughter victim appeared to him to be intoxicated or not in full command of his senses. However, defendant made no such claim.

Having concluded that the trial court did not abuse its discretion in excluding evidence of the manslaughter victim's blood alcohol level, we necessarily reject his contentions that the court's ruling violated his state and federal constitutional rights to confrontation, present a defense, have a jury trial and to due process.

_____

[28] Defendant's assertion, in his opening brief, that "several witnesses testified to the effect [the manslaughter victim's] intoxication had on the incident that resulted in his death" contains no citation to the record, nor is there any portion of defendant's statement of facts that supports such an assertion. Our review of the record also revealed no support for this assertion, as did the People's.

In the paragraphs in defendant's opening brief following the one containing the sentence quoted above, defendant asserts, "there was real time testimony from others" to "show how the victim's [blood alcohol level] and intoxication 'affected [his] judgment and behavior . . . .'" followed by several citations to the record. However, these citations concern the attempted manslaughter victim's testimony that he (not the manslaughter victim) had a few beers while at the first party; Jennifer's testimony that at the first party she was drinking, she had been drinking all night and defendant might have been drinking; Chris's testimony that he, Jennifer and defendant were drinking at the first party; Roberto's testimony that he, Jennifer, Chris and perhaps defendant were drinking at the first party; Renee's sister's testimony that the attempted manslaughter victim was drinking a particular drink that night; Renee's testimony that he, and, possibly, the attempted manslaughter victim, drank at his house; defendant's testimony that he, and perhaps Jennifer, drank at the first party, and that Chris had been drinking beer before arriving at Renee's. These portions of the record had nothing whatsoever to do with the manslaughter victim. (Defendant's citation to an assertion made by defense counsel in a pretrial discovery motion is *not* support for his factual statement.)

2. *Jury Instructions*

a. *Arming With Bats*

The following is defendant's account of the incident as is relevant to a discussion of this issue:[29]  He saw that Renee had a bat when defendant, Jennifer, Chris and Roberto arrived outside Renee's home.  He said that he saw no one else with a bat that night. When Jennifer was five feet from the manslaughter victim, and defendant was two to three yards behind her and to the left, he saw that Renee, who was standing near the manslaughter victim, was "showing [the bat] in [an] intimidating fashion, hitting it against the heel of his foot like before batters . . . go up to bat" and "mad-dogging" him.[30] Everyone in the manslaughter victim's group was "[m]ad dogging" defendant.[31]  Renee stepped in front of Jennifer and began arguing with her and cussing at her.  The attempted manslaughter victim, whom defendant described as "this big guy" took off his shirt and was pacing and starring defendant down.  As the manslaughter victim and Jennifer continued to argue, defendant joined the exchange when the manslaughter victim said he

_____

[29]  Chris also testified that Renee had a bat when Chris stepped in to stop the physical fight(s) between defendant and the victims, but the victims had discarded theirs before the physical fight(s) began and "no [one] . . . used any [baseball] bats during any fight."  All the other witness testified that either there were no baseball bats at all at the time of the crimes or the baseball bats played no part whatsoever in the physical fight(s), having been discarded before it/they began.

[30]  However, defendant told a detective that while he and Jennifer were arguing with the manslaughter victim, Renee was standing over to the side being reserved.

[31]  However, defendant testified that he did not look at the attempted manslaughter victim as he approached the manslaughter victim's group because he did not want the attempted manslaughter victim to think that defendant was "mad-dogging" him.  As a consequence, he did not see the bat in the attempted manslaughter victim's hand.

25

knew that he meant nothing to Jennifer. There was a verbal exchange between the manslaughter victim and defendant, during which Renee and the attempted manslaughter victim stared at defendant. The manslaughter victim ran up to defendant and punched him on the left side of his face. Defendant tried to pull back, but the manslaughter victim grabbed him by the collar of his shirt, pulled him down and started hitting him on the side, top and back of his head. The manslaughter victim went to defendant's right side and held him by the shirt and defendant felt that the attempted manslaughter victim was grabbing him on the left side. Defendant was bent at the waist, his head was half way down to the ground and all he could see was the ground and feet. Defendant "felt" Renee approaching because he "felt everybody was crowding" him. Defendant tried unsuccessfully to lift his head up and back into the street. He pulled the knife out of his pocket with his left hand and swung wildly up and down, including above his head, and right and left, while punching with his right hand. He anticipated a hit in the head with the bat. The victims continued to hit defendant in the head and pulled him, then the manslaughter victim backed off.[32] Defendant managed to break free from the attempted manslaughter victim and ran backwards into the street. When he looked up, Renee was restraining his sister. The attempted manslaughter victim came at defendant again, but

---

[32] Defendant told a detective that the manslaughter victim backed off "real quick" when defendant began swinging the knife, but the manslaughter victim was still ready to fight. He added, "'[T]hen the [attempted manslaughter victim] jumped in.'" He went on to describe two separate attacks—the first one by the manslaughter victim and the second, after the manslaughter victim had backed off, by the attempted manslaughter victim.

stopped when defendant called his attention to the fact that the manslaughter victim had collapsed and the attempted manslaughter victim realized that he, himself, had also been stabbed. Defendant denied trying to kill anyone or wanting to kill the manslaughter victim. Defendant testified that the "main thing" he was worried about during the fight was Renee—that some future harm would come to defendant, even though it was not happening as he was stabbing the victims.[33] He said that when he plunged the knife into the manslaughter victim the eighth time, he believed he was going to die "if certain things did happen." He said he believed he was going to die when he was stabbing the manslaughter victim, then added, "I believe . . . some bad stuff was going to happen." When asked if when he stabbed the attempted manslaughter victim the last time, he believed he was going to die, defendant answered, "Yes. That something bad was going to happened." That something was that they were going to knock him out or break his jaw or seriously hurt him and the only way to stop the attempted manslaughter victim from beating him was to stab him with the knife. However, he conceded that he did not believe he was going to die from being hit by the victims with their fists, which he did not consider to be deadly force, but from Renee. He thought the bat was going to be used

---

[33] Thus, we are puzzled by defendant's assertion, in his opening brief, that "[t]he baseball bats . . . were not the main focus of [defendant's] defense." While defense counsel was obvious in his attempt, during argument to the jury, to focus attention on the harm posed to defendant by the victims and to downplay Renee's possession of the bat (see text following fn. 44, *post*, pp. 37-38), we suspect that this is because Renee's potential use of the bat was so speculative and would probably have been rejected by the jury as the basis for defendant's claim of self-defense. However, defendant was still stuck with his own testimony that the main thing he was worried about at the time he was stabbing the victims was the possibility that Renee would use his bat on him.

27

on him—he thought it was coming at any moment while he was trying to get the victims off him by stabbing them.[34]  He thought this "because he was being attacked."  In response to leading questions by his lawyer, defendant testified that he did not think before the physical fight(s) started that he would be able to defend himself against the victims if they attacked him because of their size.[35]

The following was read to the jury, "This instruction is regarding only the acquisition of bats by the individuals that were at [Renee's house]: The owners or possessors of real property or personal property may use reasonable force to protect themselves, their guests and their property from imminent harm.  They are also allowed under the law to use reasonable force to protect the property of family members or guests from immediate harm."

Of course, Renee never used any force with a bat (or anything else) on defendant.  No other instructions given tied the notions conveyed in this instruction to any other instruction(s).  In his argument to the jury, the prosecutor tied it only to the concept of perfect self-defense by saying that Renee had a right to arm himself with a bat because Jennifer said she and defendant were coming to Renee's to do damage to someone's

---

[34]  In light of this testimony, and defense counsel's argument to the jury (described *infra*), defendant's assertion that "[t]he presence of the [baseball] bats at the scene required no explanation; it did not matter why they were there" is insupportable.

[35]  The manslaughter victim was about the same height and weight as defendant. The attempted manslaughter victim is three to four inches taller than defendant and outweighs him by 100 pounds.

car.[36]  In part, because of this, argued the prosecutor, defendant could not rely on his claim that Renee had a bat as a basis for perfect self-defense.  Defendant did not object below to this argument.  For his part, defense counsel stated during his argument to the jury that the instruction correctly provided that Renee had a right to arm himself with a bat if he believed defendant and his companions were coming over to do something to Renee's house or to property there.  However, Renee would not have been justified in using his bat just because he thought defendant and Jennifer might do something—that the harm to property or person had to be imminent or immediate.  The fact that Renee did not use the baseball bat, he argued, suggested that Renee did not feel that defendant or Jennifer posed an imminent threat of harm to his property or the people there.  He went on to argue that the fact that Renee had a baseball bat played a significant role in defendant's state of mind at the time he stabbed the victims because defendant believed the baseball bat was going to be used on him.

Defendant now claims that the presence of this instruction requires reversal of his convictions of voluntary manslaughter and attempted voluntary manslaughter.  First, defendant asserts that since the lawful reason for Renee to arm himself was not an issue in the case, the presence of this instruction distracted the jury from its primary purpose of weighing the reasonableness of defendant's actions in self-defense.  Defendant has no basis for making this assertion.  He can only speculate that the presence of this instruction

---

[36]  As already stated, Renee testified that he armed himself with a baseball bat to protect himself and his property.  (See fn. 13, *ante*, pp.7-8.)

somehow prevented the jury from determining whether he acted in self-defense, either perfect or imperfect.

Next, defendant asserts that the instruction was inappropriate because there was no unlawful conduct of his for the jury to consider before the attempted manslaughter victim attacked him without warning, nor was there an imminent threat to real or personal property or persons present at Renee's house.

As to his first assertion, he criticizes the holding in *People v. Watie* (2002) 100 Cal.App.4th 866 (*Watie*). In *Watie*, the defendant, armed with a gun, went to the home of his stepfather to retrieve his step-siblings. (*Id.* at p. 873.) As defendant stood on the front porch, talking to his stepfather through a security screen door, the latter told him to leave. (*Ibid.*) They argued and the stepfather threatened to "'whip [the defendant's] ass.'" (*Ibid.*) The defendant thought his stepfather had retrieved a gun and was about to shoot him, so he shot first, killing his stepfather. (*Id.* at p. 874.) The jury was instructed that a lawful occupant of a residence had the right to request that a trespasser leave, and if the trespasser does not comply within a reasonable time, to use reasonable force to eject the trespasser. (*Id.* at p. 876.) The jury was also told, inter alia, that an occupant may defend his or her home against anyone who manifestly intends or endeavors in a violent manner to enter the home or who appears to intend violence to anyone in the home, using the amount of force that reasonably appears necessary to resist the entry. (*Id.* at pp. 876-877.) On appeal, the defendant asserted that the giving of these instructions was error because the stepfather's justification for a killing was irrelevant and the instructions allowed the jury to presume that the stepfather was acting in lawful defense of his home,

30

thus removing self-defense from the jury's consideration. (*Id.* at p. 876.) The appellate court rejected defendant's contentions, saying "To be acquitted of responsibility for a person's death based on [perfect] self–defense, the defendant must have acted pursuant to an actual and reasonable belief in the need to defend himself under circumstances that would lead a reasonable person to fear the imminent infliction of death, or great bodily injury. [Citation.] 'The justification of self-defense requires a . . . showing [that] defendant was actually in fear of his [or her] life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person.' [Citation.] [¶] . . . [¶] . . . [*T*]*he right of a victim to defend himself* [*or herself*] *and his* [*or her*] *property is a relevant consideration in determining whether a defendant may prevail when he seeks to negate malice aforethought by asserting the affirmative defense of imperfect self-defense*. [¶] Here, the jury was confronted with the question of whether defendant's use of deadly force was justified as he confronted [his stepfather] on the front porch of [the latter's] home and whether defendant's unlawful conduct created the circumstances that legally justified [the stepfather's] use of force. If [the stepfather] had a right to use force on defendant himself in his home, then defendant had no right of self-defense, imperfect or otherwise." (*Id.* at pp. 877-878, italics added.) Clearly, *Watie* supports the giving of this instruction here and completely undermines defendant's position.

And what of defendant's contention that *Watie* "stated the rule too broadly, then narrowed it . . . by going on to explain the underlying basis for allowing the victim the defense of property instructions [if] there was . . . unlawful conduct [on the part] of the

31

defendant claiming self-defense[?]" That basis, defendant asserts was the notion that "'if one makes a felonious assault upon another, or has created appearances justifying the other to launch a deadly counterattack in self-defense, the original assailant cannot slay his adversary in self-defense unless he or she has first, in good faith, declined further combat, and second, has fairly notified the adversary that he or she has abandoned the combat.'" (*Waite*, *supra*, 100 Cal.App.4th at p. 877.) Defendant misreads *Watie*. *Watie* cited this rule, which is the familiar notion that a person who is the initial aggressor cannot claim self-defense unless he or she stops fighting and notifies the other person that he or she has stopped fighting.[37] However, the *Watie* court cited it as an introduction to

_____

[37] This notion was conveyed to the jury in another instruction given to it, which also included the concept that one engaged in mutual combat cannot claim self-defense unless certain conditions are met. Defense counsel below argued to the jury that this instruction, in part, had no relevance here because there was no evidence that defendant engaged in mutual combat with the victims and he correctly pointed out that the prosecutor did not argue that this was the case. However, he went on to set up a straw man by arguing that even though the prosecutor said that defendant was not entitled to either type of self-defense, in part, because he "created the situation" and one cannot provoke a fight or quarrel with another with the intent of creating an excuse to use force (which was based on an entirely different jury instruction) "the stronger prosecution argument is that [defendant] lost his right to self-defense because he . . . was the initial aggressor." Defense counsel claimed the attempted manslaughter victim's testimony supported the notion that defendant was the initial aggressor. However, it did not. The attempted manslaughter victim testified that defendant had pulled his hand out of his pocket holding whatever was in the pocket and moved his hand up to his waist or chest when the former hit him the first time. Defense counsel's argument to the jury aside, the jury was never instructed that this evidence could be the basis for an inference that defendant was the initial aggressor or that it constituted an assault, which could form the basis for inferring that he was the initial aggressor. In fact, the instruction itself implies more the layperson's understanding of what an initial aggressor is, i.e., the person who hits first. Moreover, in her opening argument to the jury, the prosecutor never argued that defendant was the initial aggressor. It was not until after defense counsel spent a majority of his argument trying to refute the straw man that he, himself created, that, in

*[footnote continued on next page]*

32

its explanation of one of the holdings in *People v. Gleghorn* (1987) 193 Cal. App. 3d 196 (*Gleghorn*), a holding[38] which *Waite* was not relying on for its holding.  Instead, *Watie* relied on the holding in *Gleghorn* that the *Gleghorn* trial court did not err in giving an instruction on the right of a resident to use deadly force on a trespasser, which instruction was identical to one of the ones at issue in *Waite* because "'the victim . . . ha[d] the right to defend himself against a violent attack in his own house . . . .'  [Citation.]" (*Watie*, *supra*, 100 Cal.App.4th at pp. 876-878.)  The *Watie* court also cited *People v. Hardin* (2000) 85 Cal.App.4th 625, commenting that it and *Gleghorn* establish that the right of a victim to defend him-or herself and his or her property is a relevant consideration in determining whether a defendant may prevail when the defendant seeks to negate malice aforethought by asserting the affirmative defense of imperfect self-defense.  (*Waite*, *supra*, 100 Cal.App.4th at pp. 877-878.)

It must also be remembered that Roberto, Renee and his sister,[39] testified that Renee and his sister told defendant and Jennifer to leave several times before the physical

---

*[footnote continued from previous page]*
her closing argument, the prosecutor briefly asserted that defendant was the initial aggressor.  Of course, defense counsel argued that there was insufficient evidence to prove beyond a reasonable doubt that defendant was the initial aggressor.

[38]  That holding was whether when the original aggressor, in that case, the defendant, committed a simple assault on the victim, and the victim responded with deadly force, the defendant would be allowed to respond to that with deadly force. (*Gleghorn*, *supra*, 193 Cal.App.3d at pp. 200-201.)  This had nothing whatsoever to do with the facts in either *Watie* or here.

[39]  The sister was also a resident of the house.

fight(s) and Renee called the police at that time and said he wanted them to leave.[40]

Therefore, there was evidence that defendant was a trespasser at the time of the fight(s).

This, of course, refutes defendant's current claim that he was not engaged in unlawful

conduct when he was first hit by the attempted manslaughter victim.

By confining the jury's consideration of Renee arming himself with a baseball bat

to the issue whether defendant acted in perfect self-defense, the prosecutor took a more

conservative position than the court in *Watie*, which held that such a fact was also

relevant to the defense of imperfect self-defense.

As to defendant's remaining contention that there was no imminent threat to

persons or property at Renee's, the evidence is otherwise.[41]

Defendant also contends that the instruction is an improper pinpoint instruction.

An improper pinpoint instruction is one that "invite[s] the jury to infer the existence of [a

party's] version of the facts . . . ." (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)  The

instruction at issue did not do this.  It merely informed the jury that if it found that the

people or property at Renee's were subject to imminent or immediate harm, the

possessors or owners of real or personal property could use reasonable force to protect

that property.  This did not invite the jury to accept the People's version of the facts that

---

**[40]** The attempted manslaughter victim, Renee and his sister all testified that defendant and Jennifer had been told to leave.  Chris testified that the manslaughter victim and a male and female at the house did not want Jennifer and defendant to be there.  Roberto and Renee's sister also testified that the attempted manslaughter victim told defendant that defendant had come to the wrong neighborhood.

**[41]** See footnotes 5, 6, and 13, *ante*, pages 5, 7 and 8.

defendant and Jennifer, in fact, threatened personal property at Renee's house or posed a threat of immediate harm to the people there.

Finally, as in *Watie*, the fact that this jury convicted defendant of voluntary manslaughter and attempted voluntary manslaughter suggests that they credited defendant's claim of imperfect self-defense, despite the presence of this instruction. (*Watie*, *supra*, 100 Cal.App.4th at pp. 878, 879.) Thus, defendant could not have possibly suffered any prejudice by its inclusion at this trial.

b. *Use of Hands or Fists*

The jury was instructed that if defendant acted in perfect self-defense, he was not guilty of any of the charged offenses, except possession of a dirk or dagger. Further, if defendant acted in imperfect self-defense, he would be guilty of voluntary manslaughter and attempted voluntary manslaughter, but not murder or attempted murder. For either type of self-defense, defendant must have believed he was in imminent danger of, inter alia, suffering great bodily injury. Great bodily injury was defined as "significant or substantial physical injury. It is an injury that is greater than minor or moderate harm." Defendant unsuccessfully sought the following addition to this last sentence, "Such injury may be inflicted by the hands or fists." Defendant here claims that the trial court's failure to grant his request requires reversal of his convictions for voluntary manslaughter and attempted voluntary manslaughter. We disagree.

The prosecutor correctly pointed out during his argument to the jury that defendant never said during direct examination by his attorney that he was in fear of great bodily injury at the hands of the victims at the time he stabbed them. In fact, it was not until

35

redirect examination, when defense counsel essentially "fed" the words to defendant, that

he claimed he was in such fear.[42] The prosecutor then asserted that the only bodily injury

defendant testified he feared was a hit to his face, which would have been impossible had

he been in the bent over position he claimed he was.[43] The prosecutor further pointed out

that the fear had to be the only reason defendant used deadly force and she asserted that

---

[42] During cross-examination, the prosecutor asked defendant if while he was stabbing the manslaughter victim, whether he felt the latter was going to kill him with his fists. He responded that he did not know what was going to happen. When asked if he felt, when he was stabbing the attempted manslaughter victim, that he was going to die, he responded that he did not know. Later during cross-examination, he testified that he felt "some bad stuff was going to happen" to him while he was stabbing the manslaughter victim. The prosecutor asked defendant if, while defendant was stabbing the attempted manslaughter victim, defendant believed he was going to die. Defendant responded, "Yes. That something bad was going to happen." But, he added that he did not believe he was going to die from the victims beating him with their fists, but from Renee hitting him with the bat. He added that the force the victims used on him was not deadly force. However, he felt that he was taking a terrible beating by being punched repeatedly in the face and top and back of the head and on the back of his body. During redirect, defense counsel asked defendant what the "something" was that he feared was going to happen while he was stabbing the victims and he testified it was "[t]hat they were going to knock me out or break my jaw or seriously hurt me." Counsel then asked defendant if he felt that something was going to happen to his face if he didn't do something. When asked what that was, defendant said they would break his jaw or his nose or seriously hurt him. However, on re-cross, he conceded that because his head was down, the victims were not hitting him in the face. He conceded that when he stabbed the manslaughter victim, he did not know if he was suffering great bodily injury. He said that at no point did he believe that he was going to die from the victim's hitting him, therefore, he had to kill them. Finally, on further re-direct, defense counsel asked defendant, " . . . [D]id you feel that you were going to suffer serious bodily injury?" and defendant answered in the affirmative. He added that he stabbed them to stop them from beating him further. However, he conceded on further cross-examination, that he began stabbing the victims from the beginning, the inference being that this was before they inflicted so many blows that he feared serious bodily injury.

[43] But see footnote 42, *ante*.

defendant's anger at the manslaughter victim was also a reason he fatally stabbed the latter. She also pointed out the defendant used deadly force immediately, instead of waiting until he had been hit several times by the victims. Finally, she asserted that his claim that he was being beaten severely by the victims was contradicted by his report to a detective that he was not injured and by his lack of wounds after the crimes. In other words, the prosecutor never claimed that the serious bodily injury, the fear of which could have created either perfect or imperfect self-defense, could not have resulted in the victims' use of their hands or fists. In fact, she appeared to concede the matter.[44] As stated before, defense counsel essentially abandoned the claim that defendant stabbed the victims because he feared being hit with the bat by Renee. However, not surprisingly, defense counsel asserted that defendant's belief that if he had not used the knife, he

---

[44] We do not agree with defendant that two remarks the prosecutor made during argument to the jury suggested that serious bodily injury could not be inflicted by hands or fists. The first was during the prosecutor's discussion of why the manslaughter victim began hitting defendant after defendant had stabbed the attempted manslaughter victim. The prosecutor said, "[The manslaughter victim] steps over [to where defendant is] because he knows that what the [d]efendant has done to [the attempted manslaughter victim] is not appropriate. . . . [T]he reality of the matter is bringing a knife to a fist fight, everybody knows that's not right. That's not fair. That's just common sense." Here, contrary to defendant's claim, the prosecutor was not attempting to undermine the notion that serious bodily injury could be inflicted by hands or fists. She was, rather, arguing that defendant's response to what the victims were doing to him was unreasonable because he was using lethal force and they were not. The prosecutor repeated this during her closing argument when she said, "How about the [requirement that] you use [no] more force than necessary. . . . [I]t has to be reasonable force. [Defendant] brought a knife to a fist fight." We also disagree with defendant that a jury question, during deliberations, revealed the jury's confusion over the matter. The jury asked, "Does a person have a right to self-defense with a deadly weapon?" This has nothing to do with the concept that serious bodily injury can result from the application of hands or fists.

would have suffered "a broken nose, a fractured orbital . . . , a broken jaw, get knocked out", "[got] poun[d]ed into the ground", or suffered "a totally bruised up face" was sufficient to support self-defense. As to this specific issue, defense counsel said, "[T]here is nothing in [the instruction on self-defense] that suggests that great bodily injury cannot be caused by hands and fists. . . . And common sense dictates that it absolutely can be caused by hands and fists." "Great bodily injury can certainly be inflicted by hands or feet." The prosecutor did not object to any of these remarks.

We determine whether, in light of all the above, there is a reasonable likelihood that the jury understood that great bodily injury could not be inflicted by hands and fists. (See *People v. Kelly* (1992) 1 Cal.4th 495, 525.) The arguments of counsel are to be considered in making this determination. (*Id*. at p. 526.) If there was ever a doubt in the minds of jurors, under the instructions given, whether great bodily injury could be inflicted by hands and fists, that doubt was completely extinguished by the comments of both the prosecutor and defense counsel. Therefore, there is no reasonable likelihood that the jury believed that great bodily injury could not be inflicted by hands or fists.

3. *Cumulative Error*

Having concluded there was no error in the exclusion of evidence or the giving of instructions, we necessarily reject defendant's contention that the cumulative effect of these errors requires reversal.

4. *Imposition of Fees*

The sentencing court ordered defendant to reimburse the City of Rialto for booking fees in the amount of $79.86 and to pay "court security fees" in the amount of

38

$70 per count, or $210, total. The minutes of the sentencing hearing show that the latter was for "Criminal Assessment and Security" for counts 1, 2 and 4. The abstract of judgment, however, incorrectly adds to the list of counts count 3, for which defendant was not convicted. Therefore, the abstract must be corrected. It also omits the order that defendant reimburse the City of Rialto for booking fees in the amount of $79.86, and this must be corrected.

Relying on *People v. High* (2004) 119 Cal.App.4th 1192, defendant asserts that the trial court is required to report in the abstract of judgment the statutory basis for each fee imposed. Defendant misreads *High*. Therein, the sentencing court, in its oral pronouncement of judgment, imposed "a drug program fee, *together with surcharges and penalties in the total sum of $1,530*" and "a clandestine drug lab fine, *together with penalties, assessments and surcharges totaling $1,700*." (*Id*. at p. 1200, italics added.) The minute order stated that the $1530 was a drug program fee. The minute order and abstract of judgment stated that the $1700 was a clandestine drug lab fine. (*Ibid*.) The appellate court held, "All fines and fees must be set forth in the abstract of judgment. [Citations.] . . . If the abstract does not specify the amount of each fine, the Department of Corrections cannot fulfill its statutory duty to collect and forward deductions from prisoner wages to the appropriate agency. [Citation.] At a minimum, the inclusion of all fines and fees in the abstract may assist state and local agencies in their collection efforts." (*Ibid*.) The *High* court never held that the statutory basis of each fee must be set forth in the abstract of judgment, or anywhere else. It merely held that the fees must be sufficiently identified so that the state and local agencies would know what to collect. In

39

its disposition, the appellate court in *High* ordered the trial court to "separately list, with the statutory basis, all fines, fees and penalties imposed on each count . . . ." (*Id.* at p. 1201.) A dispositional order by an appellate court is not the holding of the case. Defendant cites no other authority for the proposition that the abstract must contain the statutory provisions for each fine or fee imposed.

However, as the People concede, it is more accurate, in this case, for the $70 "criminal assessment and security fees" to be designated as $40 for the court security fee and $30 for the criminal conviction fee, each per conviction. Therefore, we will order the trial court to amend both the minutes of the sentencing hearing and the abstract of judgment to reflect this.

## DISPOSITION

The trial court is directed to amend the minutes of the sentencing hearing and the abstract of judgment to show that $30 per conviction was imposed as a criminal conviction fee and $40 per conviction was imposed as a court security fee. The trial court is further directed to amend the abstract to omit any reference to a fee being imposed for count 3 and to include the order that defendant reimburse the City of Rialto for its $79.86 booking fee. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

RICHLI
J.